Nicholas D. Smith
David B Smith PLLC
1123 Broadway, Ste 909
New York, NY 10010
nds@davidbsmithpllc.com
917-902-3869

Attorney for Defendant ADAM LEVIN

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ADAM LEVIN,<br><br>Defendant. | Case No. 2:24-cr-00754-SB<br><br>**ADAM LEVIN'S SENTENCING MEMORANDUM** |

Adam Levin, through his counsel of record, hereby files his sentencing memorandum.[1]

Dated: July 17, 2026

DAVID B SMITH PLLC

By: */s/*
Nicholas D. Smith

Attorney for Defendant ADAM LEVIN

[1] The Court's Criminal Standing Order (CSO) permits 20-page sentencing memoranda and 10-page reply memoranda. CSO § 9. The government has already filed its submission and will be filing a revision (see below). Therefore, for the Court's convenience, Mr. Levin combines his total permitted pages into one submission and will not submit a separate reply filing.

## I. INTRODUCTION

Pursuant to a plea agreement, Adam Levin pled guilty to one count of conspiracy to tout securities for undisclosed compensation, in violation of 18 U.S.C. § 371. Mr. Levin was one of many stock issuers entangled in Jonathan William Mikula's scheme to extract undisclosed compensation from issuers in exchange for promoting their securities in Palm Beach Venture ("PBV"), an investment publication where Mikula worked and wrote articles.

The anti-touting statute does not prohibit issuers from compensating stock promoters that tout their securities offerings. Rather, it places a duty on the promoter to disclose such payments to potential investors. 15 U.S.C. § 77q(b). Mr. Levin's investigation marks the first time a securities issuer has been criminally charged with an anti-touting offense under the federal securities laws. Before he was charged, Mr. Levin settled the same claims civilly with the Securities and Exchange Commission, paid a significant financial penalty and agreed to a three-year officer and director bar. A number of other issuers made greater undisclosed promotional payments to Mikula than Mr. Levin. Although these issuers incurred sterner penalties than Mr. Levin in their SEC settlements, they were not criminally charged.

This offense constitutes aberrant conduct in Mr. Levin's otherwise commendable business career. For more than 20 years, Mr. Levin spearheaded many successful business ventures, including High Times Holding, Inc. ("HTH"), the relevant issuer in this case. Mr. Levin's desire to grow HTH clouded his judgment and led him to participate in Mikula's undisclosed promotion scheme. Fortunately, no victim has claimed substantial financial hardship.

Mr. Levin stands apart in his lifelong commitment to his friends, his family, and the community. He has taken his conviction as an opportunity to improve himself and those around him. He has demonstrated exceptional rehabilitation efforts, including establishing a non-profit reentry organization serving justice-

impacted individuals.

The government will be revising its sentencing submission to request a noncustodial sentence.[2] Given his personal and professional history, the need to avoid unwarranted sentencing disparities, the fact that deterrence has already been accomplished, and his extremely low risk of recidivism—Mr. Levin respectfully agrees with the government that a noncustodial sentence is "sufficient, but not greater than necessary" to achieve justice in light of the sentencing factors set forth in 18 U.S.C. § 3553(a).

## II. THE PLEA AGREEMENT, PSR, AND GUIDELINES CALCULATION

Mr. Levin's plea agreement provides the following Sentencing Guidelines calculation:

12. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | USSG § 2B1.1(a)(2) |
| Specific Offense Characteristics: | | |
| Gain More than $150,000 | +10 | USSG § 2B1.1(b)(1)(F) |
| Offense Involved ≥ 10 Victims | +2 | USSG § 2B1.1(b)(2)(A)(i) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Adjustment: | | |
| Obstructing and Impeding the Administration of Justice | +2 | USSG § 3C1.1 |

Plea Agreement, ECF 8 at 13. Adopting the agreement's calculation, the Probation Office then subtracted three levels for acceptance of responsibility and two levels for Zero-Point Offender, leaving a Total Offense Level of 17.

[2] Mr. Levin's counsel apologizes to the Court for filing this submission after the deadline set in the Court's CSO. The parties were discussing a potential revision of the government's sentence request in the days leading up to and following the deadline. Counsel intended to promote judicial economy by first completing that process and incorporating the outcome into one defense filing, rather than burden the Court with iterative updates.

Determining that Mr. Levin stood in Criminal History Category I, Probation calculated his sentencing range at 24 to 30 months' incarceration.

Two days after the PSR was released—on April 16, 2026—the United States Sentencing Commission promulgated amendments to the Sentencing Guidelines, which become effective November 1, 2026. At least two are relevant here.

First, under the inflationary adjustment to the Loss Table in § 2B1.1(b)(1), loss of more than $150,000 results in an increase of eight offense levels, rather than the 10 calculated by Probation. U.S. Sentencing Commission, Proposed Amendments, Dec. 12, 2025 at 44, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf. Second, the residual clause of the sophisticated means specific-offense characteristic—§ 2B1.1(b)(10)(C)—is eliminated. *Id.* at 158. Probation added two offense levels to Mr. Levin's total under the residual clause.

Thus, if Mr. Levin's Guidelines calculation is scored under the Amendments that become effective in a few months, his Total Offense Level would be 13. That moves him to Zone C of the Sentencing Table, with a range of 12 to 18 months. U.S.S.G., Ch. 5 pt. A. Mr. Levin's conviction is eligible for probation. 18 U.S.C. §§ 3561, 3559.

## III. APPLICATION OF THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### A. The Nature and Circumstances of the Offense Support a Probationary Sentence

#### 1. *The unprecedented nature of Mr. Levin's charge*

The unprecedented nature of a criminal anti-touting charge against a stock issuer—and the exceptional rarity of such a charge against any party—are a basis for varying downward significantly.

As indicated, the anti-touting statute does not prohibit issuers from

compensating stock promoters that tout their securities offerings. Rather, it creates a duty to disclose such payments to investors—a duty Congress imposed on stock promoters:

"It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, ***to publish, give publicity to, or circulate*** any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, ***from an issuer, underwriter, or dealer***, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."

15 U.S.C. § 77q(b) (emphasis added). The statute thus presumes that an issuer, underwriter, or dealer has provided consideration to a promoter in exchange for a promotion of the stock and seeks to prohibit the promoter from publishing the promotion without disclosing the compensation.

Mr. Levin understands that the government shares this interpretation of the statute, as its limitations on liability are well recognized. As one federal court observed, "nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation." *See Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005). Rather, "as the plain language of Section 17(b) [of the Securities Act] makes clear," Congress placed the "burden" of the statute "on the person who *publishes* the analyst's report" but not on "the *issuer* who has paid for the puffery." *Id.* (noting that in the "public prosecutions brought under Section 17(b)" cited, the defendants were "*reporters* or *analysts*, and not *issuers* of stock") (emphasis original).

Indeed, the Eleventh Circuit has explicitly held that "under the securities laws," it is "both contemplated and permitted" that an issuer will pay an analyst for press coverage. *In Re Galectin Therapeutics*, 843 F.3d 1257, 1272-74 (11th Cir.

2016) (explaining that Section 17(b) does not "prohibit" payments from issuers or require any disclosure from issuers about such payments; the statute addresses only "the person who receives" the compensation); *Noto v. 22nd Century Group Inc.*, 35 F.4th 95, 103 (2d Cir. 2022) (only the "maker" of an article promoting a stock "not its benefactor, has a duty to disclose that it was paid for").

It is undisputed that Mr. Levin was not the promoter, publisher, or touter of the advertisements in PBV. *See generally* Dkt. No. 8 at 7–13; Dkt. No. 23 at 12–17. He was the chairman of HTH, the issuer of a Reg. A offering. Dkt. No. 8 at 2, 8. He held no position of employment or leadership at PBV and exercised no editorial control over its publications. *See generally* Dkt. No. 8 at 7–13; Dkt. No. 23 at 12–17. This accounts for why Mr. Levin was charged with conspiracy, rather than principal, liability.

Outside this investigation, Mr. Levin cannot locate another case in which an issuer as such (or an agent of an issuer, like Mr. Levin) was held criminally liable for violations of Section 17(b) under a conspiracy or accomplice liability theory. This Court accepted a guilty plea from another agent of an issuer who was involved in Mikula's scheme. Minutes of Change of Plea Hearing, *United States v. Beri,* Case No. 2:24-cr-00063-SB-3 (C.D. Cal. Feb. 27, 2024), ECF 41. In *Beri*, however, the defendant-issuer was himself an agent of Mikula and profited from his stock promotion. *Id.*, ECF 109 at 3. Indeed, it was Beri who recruited Mr. Levin to Mikula's touting scheme. Thus, Beri's § 77q(b) liability did not depend on his status, and role in the scheme, as an issuer.

A legal principle lies behind the absence of precedent. Where Congress has chosen to limit the class of individuals liable under a statute, circumstances exist in which the government may not circumvent that exclusion by charging those individuals under conspiracy or accomplice liability provisions. *Gebardi v. United*

*States*, 287 U.S. 112, 121-22 (1932).[3]

Indeed, anti-touting is rarely charged as a criminal offense against any party. Counsel collected relevant data from Lexis/Westlaw and the U.S. Sentencing Commission:

- Of nearly 6,000 cases involving any subsection of § 77q since enactment in 1934, just over 4,000 were SEC civil actions, with nearly all the remaining matters involving private civil litigation;
- Only six criminal cases appeared to involve § 77q(b) specifically. All six involved additional fraud and/or money laundering charges;
- Sentencing Commission data for fiscal year 2005 through 2024 covered nearly 1.5 million sentencings. Counsel identified only one case where the sole conviction was for § 77q(b). *United States v. Gagnon*, 4:12-cr-20753-MAG-MJH (E.D. Mich. 2013). However, in that case, the company was "a fraudulent scheme with no legitimate profits, and returns to investors were paid out of new investor money." *Id.*, ECF 33 at 4.

[3] *See also United States v. Hoskins,* 902 F.3d 69 (2d Cir. 2018) (applying *Gebardi* to exclude foreign nationals from FCPA liability, including conspiracy); *United States* v. *Shear*, 962 F.2d 488 (5th Cir. 1992) (conspiracy charge cannot be used to circumvent liability limitations in the Occupational Safety and Health Act); *United States* v. *Castle*, 925 F.2d 831, 831 (5th Cir. 1991) (*Gebardi* principles prohibit the government from using § 371 to charge foreign nationals under FCPA); *United States* v. *Amen*, 831 F.2d 373, 381 (2d Cir. 1987) (because 21 U.S.C. § 848 exclusively places liability on enterprise "leadership," Congress intended to leave "unpunished" the "lieutenants and foot soldiers"); *United States v. Tilotta,* Case No. 19-cr-4768, 2023 WL 2565169, at *4 (S.D. Cal. Mar. 17, 2023) (because Congress had "intentionally enacted [Section 924(a)] to exclude licensed firearm dealers" from felony charges, it "would be absurd" if the court were to "allow[] [a] prosecutor[ ] to circumvent [Section 924(a)'s] statutory scheme through accomplice liability.").

Mr. Levin has not moved to dismiss the anti-touting charge on *Gebardi* grounds and does not resile from his guilty plea. But this principle is surely relevant to the "nature of the offense." Another reason this consideration is germane to sentencing is that Mr. Levin's anti-touting violation is criminal only insofar as his conduct was "willful." § 77x. While sufficient evidence of a defendant's willfulness may exist in a prosecution resting on a novel theory of liability, the diminished degree to which such a defendant exhibits that mental characteristic is still penally significant. The Court can and should take these considerations into account in determining whether to vary downward and to what extent.

2. *Mr. Levin's Role in High Times Holding, Inc.*

In 2017, Mr. Levin acquired HTH, an events and media company that had published High Times magazine since 1974. Over the years, High Times has featured iconic covers with the likes of Bob Dylan and Snoop Dogg. Mr. Levin hoped to reverse HTH's commercial decline and, for several years, he devoted his energy and much of his own savings to the company.

Mr. Levin transformed HTH's business model by expanding into retail markets beginning in 2020. This strategic shift led the company to embark on a new trajectory with improved margins and reduced risk compared to its events business. The diversification was heralded by mainstream media and paved the way for other lucrative partnerships. By the end of 2022, HTH began producing and marketing their own products, further evolving the company.

With Mr. Levin at the helm, HTH's year-over-year (non-GAAP) revenues steadily increased. For example, HTH posted $14,481,000 in revenue in the 2017 fiscal year—the year Mr. Levin assumed control of operations. By 2022, the company's revenue had grown to $52,915,000. In short, during the period of Mr. Levin's leadership, HTH became a stronger company with a more diverse revenue base. This success led Mr. Levin to offer securities via a Regulation A offering to raise investor capital and further grow the brand.

3. *HTH's Reg A Offering and Palm Beach Venture's Undisclosed Touting*

In 2018, HTH sought and obtained approval from the SEC to offer securities via a Reg A offering (the "Offering") to raise investor capital. HTH received SEC qualifications for Reg A offerings in March and July 2018. Prior to the Offering, HTH had never sought investments from the greater public. The Offering Circular available to all prospective investors laid out several substantial risk factors for investment. For example, HTH was candid about whether it would be able to provide timely and accurate financial reporting, which it had not previously done. The Offering Circular was direct about the overall risks associated with the cannabis industry, disclosing that cannabis remained a Schedule I narcotic under federal law and that HTH's "business and business prospects depend, in large measure, on the anticipated growth of the Cannabis industry." In addition to emphasizing the uncertain regulatory landscape, HTH also disclosed that the cannabis industry as a whole "is intensely competitive and the High Times Group expect competition to intensify further in the future."

Even with the disclosure of these extensive risks, HTH attracted significant investment in the first year of the Offering. As of October 11, 2019—approximately six months before the first promotion charged in the Information—HTH had already issued nearly 1.4 million shares and raised $15,373,424 through the Reg A Offering.

In 2020, Mr. Levin met with Mikula of PBV. The relevant facts are as follows: 1) in April 2020, "D.L.", an associate of Mikula's, persuaded Mr. Levin to engage D.L. to perform marketing services for HTH, with respect to PBV and other audiences. HTH would make payments to D.L.'s Canadian company; 2) four months later, in communications with another colleague of Mikula's, Christian Fernandez, Mr. Levin was given to understand that PBV's promotion of HTH depended on the company's payments under the marketing agreement; 3) Mr. Levin made $150,000 in total payments under the agreement; and 4) PBV promoted HTH

on two occasions, April 6, 2020 and September 23, 2020. Information at 7-9.

Other significant events, however, transpired in 2020 that drove investor interest in HTH outside of PBV's promotions. In 2020, HTH finalized a deal to acquire a chain of retail dispensaries from Harvest Health and Recreation, Inc. and announced a lucrative partnership with Red White and Bloom, Inc. to market HTH branded products. Both developments generated significant positive press. These events led to articles in financial media outlets including Bloomberg, Forbes, Benzinga, and Yahoo Finance among many others.

In total, HTH raised approximately $36 million via the Reg A Offering. Of that, more than $15 million was raised before any PBV promotion. As determined by the Probation Office, only $6 million—approximately 16%—is attributable to the PBV promotion. PSR ¶ 19.

Moreover, no evidence exists that HTH's investors were greatly harmed by PBV's promotion. Out of the two investor-victims who submitted victim impact statements to Probation, neither reported a substantial financial hardship as described by U.S.S.G. § 2B1.1(b)(2)(A)(i). Accordingly, Probation did not make an affirmative finding that any victim suffered "substantial financial harm." PSR ¶41(f). Furthermore, there is no allegation that Mr. Levin personally benefitted from the unlawful promotion, unlike his alleged co-conspirators. Instead, the benefit of the promotion flowed to HTH. *See generally* Dkt. No. 8, 7–12.

4. *SEC Judgment*

As a result of PBV's promotion, Mr. Levin stipulated to a judgment with the SEC, whereby he agreed: (a) to be permanently enjoined from violating securities laws; (b) to be prohibited for a period of three years from serving as an officer or director of any issuer that has a registered class of securities or that is required to file reports under the Exchange Act; and (c) to pay a civil penalty in the amount of

$111,614.[4] Mr. Levin paid the civil penalty in its entirety. The funds are thus available as compensation to qualifying investors under the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.

To someone like Mr. Levin who has spent his entire career working in securities, the SEC officer/director bar represents a significant and meaningful punishment. The instant felony conviction alone will undoubtedly serve to further limit Mr. Levin's professional future. In fact, Mr. Levin has already begun experiencing the shame and stigma that stems from a heavily publicized criminal case, including public backlash related to his guilty plea and cooperation with the government. Courts have recognized that such consequences, including reputational harm and loss of professional opportunities, are relevant to sentencing. *See*, *e.g.*, *United States v. Schulman*, No. 16 Cr. 442 (E.D.N.Y. Oct. 6, 2017), ECF 155 at 36-40 (imposing a probation sentence on a defendant tipper after finding "the defendant has already been subjected to substantial and meaningful punishment," including the stigma of a felony conviction, loss of his law license, and reputational damage).

### B. The Need to Avoid Unwarranted Sentencing Disparities and the Risk of Injustice Support a Probationary Sentence

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." A probationary sentence is necessary to avoid such disparities—both in comparison to similarly situated issuers involved with Mikula and Mr. Levin's named co-conspirators. *See United States v. Menendez*, 600 F.3d 263, 269 (2d Cir. 2010) ("[A] district court may compare co-defendants' sentences to avoid unwarranted sentencing disparities.").

First, Mr. Levin's criminal prosecution stands out as an anomaly when

[4] Judgment, *SEC v. Levin*, No. 2:23-cv-08081CAS (C.D. Cal. Jan. 04, 2024), ECF No. 8.

compared to the other issuers *who did not face any criminal prosecution* for compensating Mikula to promote their companies. For example, in a civil enforcement action, the SEC charged Rick Bentley with participating in the fraudulent promotion of his company's securities by concealing payments to Mikula. According to the SEC complaint, Bentley's company, Cloudastructure, issued eight payments totaling $650,000 to Mikula pursuant to a sham consulting agreement between Bentley's company and an entity designed to conceal the compensation.[5] In addition to negotiating the sham consulting agreement, Bentley (1) advised the entity on how to prepare the sham invoices so that they would "sail through" without raising questions from Cloudastructure's Chief Financial Officer; (2) approved all the sham invoices from the entity; and (3) directed Cloudastructure to pay all the sham invoices.[6] To accomplish the offense, an overseas entity was used to obscure the payments that were eventually routed to Mikula for promoting Cloudastructure. In addition, Bentley compensated Mikula with cash and lavish entertainment, including over $350,000 in hotel accommodations, meals and bottle services at clubs, yacht rentals, the engagement of entertainers, and other such expenses.[7] The chart below illustrates a side-by-side comparison:

| | Bentley (per SEC) | Levin (per PSR) |
|---|---|---|
| Amounts paid to Mikula | $650,000 | $150,000 |
| Amounts paid in entertainment | $350,000 | $30,000 |
| Investor funds raised through promotion | $30 million | $6 million |

[5] Compl. at ¶ 5, *SEC v. Bentley*, No. 2:23-cv-02119-JDP (E.D. Cal. Sept. 27, 2023), ECF No. 1.

[6] *Id.* at ¶ 39.

[7] *Id.* at ¶ 34.

Yet Bentley was not criminally prosecuted, so he will not face prison time, a felony conviction, or the lifelong consequences that flow from such a conviction. And he is just one such example of an issuer who engaged in similar activities to Mr. Levin but did not face federal criminal prosecution. In fact, Mikula promoted without disclosure other issuers who have not faced either SEC actions or criminal prosecution. This group includes an issuer explicitly alleged as an unnamed co-conspirator in the Information filed against Mr. Levin.

Similarly, James DeMesa, of Emerald Health, paid a penalty almost as high as Mr. Levin's—$103,591—but was barred from serving as a director or officer for five years, i.e., nearly twice the length of Mr. Levin's bar. Final Judgment as to James M. DeMesa at 3-4, *Securities and Exchange Commission* v. *Mikula,* Case No. 2:22-cv-07096-SB-PLA (C.D. Cal. Oct. 20, 2022), ECF 18. DeMesa was not criminally charged.

A custodial sentence for Mr. Levin when compared to these unprosecuted issuers, including those with more aggravated offense conduct in the eyes of the SEC, would generate unwarranted disparities in penalties and result in an injustice.

Second, a custodial sentence for Mr. Levin would also cause unwarranted sentencing disparities compared to the only other "issuer" charged in this district in connection with Mikula's scheme. As indicated, Raj Beri's anti-touting liability did not depend on his status as an issuer who paid for undisclosed stock touting, as with Mr. Levin. Rather, Beri orchestrated the consulting agreements Mikula used to hide the payments from the issuers, including Bentley and Levin, thereby serving as an agent of the stock promoter. Beri was paid a percentage of the touting profits. Thus, a custodial sentence in his case was not unprecedented in the same way it would be in Mr. Levin's case.

Critically, Mikula, as the touter himself and the instigator of a broader scheme

to extract compensation from issuers, was sentenced to 28 months in prison.[8] He has been described as a "recidivist securities law violator with a prior federal felony conviction for lying," and he was credited with an "integral" role in the promotion scheme.[9] In fact, Mikula, as an analyst for PBV, had full discretion to influence and determine which securities offerings PBV would tout and drafted the promotional pieces for the offerings.[10]

Finally, anti-touting violations are traditionally handled through civil remedies, even for the promoters themselves, thereby creating an additional disparity from a custodial sentence, which is reserved for criminal defendants. This is yet another reason why a noncustodial sentence is appropriate for Mr. Levin.

### C. Mr. Levin's History and Characteristics, Including His Exceptional Rehabilitation and Community Service Efforts, Support a Probationary Sentence

#### 1. *Mr. Levin's Family and Childhood*

Mr. Levin was born and raised in California. His father was verbally and physically abusive to his mother. When Mr. Levin was in grammar school, his mother finally found the courage to seek a divorce. Family friends describe the divorce proceedings as volatile and traumatic, leaving deep emotional scars on Mr. Levin and his younger brother, Ari. After the divorce, Mr. Levin travelled frequently between his parents' separate homes in Los Angeles and Phoenix. When Mr. Levin was old enough to make his own decision about the time he spent with

---

[8] Minutes of Sentencing, *United States v. Mikula, et. al.*, 2:24-cr-00063-SB (C.D. Cal. Oct. 21, 2025), ECF No. 131.

[9] Government's Sentencing Memorandum, *United States v. Mikula, et. al.*, 2:24-cr-00063-SB (Oct. 7, 2025 C.D. Cal.), ECF No. 100.

[10] Information, *United States v. Mikula, et. al.*, 2:24-cr-00063-SB (Jan. 1, 2024 C.D. Cal.), ECF No. 100.

each parent, he chose his mother, and the estrangement from his father which followed lasted for almost three decades. With the help of his therapist, Mr. Levin now understands that the chronic anxiety that he has suffered from throughout his life likely has its origins in the fear that he felt as a child, witnessing his parents' dysfunctional marriage and his father's abuse.

Following the divorce, Mr. Levin's mother remarried. Mr. Levin's stepfather struggled with severe depression and violent behavioral patterns, so while the family was financially secure, there was little emotional stability in the home. Mr. Levin also witnessed drug use in the home stemming from his stepfather's addiction to cocaine and marijuana. PSR ¶ 69. Mr. Levin reacted by assuming the role of "protector" for his mother and younger siblings, which now included a younger sister. Despite the tension and stress in Mr. Levin's immediate home, Mr. Levin was lucky enough to have a supportive and loving extended family. His moral compass and his sense of right from wrong was instilled in him by his maternal grandfather, a Holocaust survivor who had lost both his parents and four of his siblings to the genocide. As a young man and without a penny to his name, Mr. Levin's grandfather emigrated to the United States. He was a refugee with every reason to focus solely on his own survival, but instead he dedicated his life to sponsoring the immigration of his four surviving siblings, their spouses, and their children. Mr. Levin looked up to his grandfather and believes that his grandfather sought to teach him an important lesson: when you survive the fire, you do not walk away; you turn back and pull others out. That principle—*i.e.*, that when one is doing well, one must seek to use his good fortune to benefit others—was reinforced to Mr. Levin by his grandfather time and again during his childhood. And Mr. Levin has lived by that principle through his significant community service efforts both before and after the prosecution of this case, as discussed below.

As an adult, Mr. Levin is the caregiver for his mother, Lori Abramowitz, as she battles Waldenström macroglobulinemia (a type of non-Hodgkin lymphoma)

and a recurrent brain tumor. Mr. Levin's mother and his stepfather are separated and live across the country from each other. To care for Lori, Mr. Levin now resides with her so that he can provide her with the day-to-day care that she requires. Mr. Levin also directs his mother's medical care, securing, managing, and communicating with an array of specialists. While Mr. Levin's sister currently resides in Los Angeles, she is younger, does not live with Lori, and has a job as a nanny for a family. Mr. Levin thus bears the primary responsibility for his mother's medical and day-to-day care, including driving her to doctor's appointments, managing her medication compliance, grocery shopping, and other necessary tasks.

2. *Mr. Levin's Contributions to the Community*

Mr. Levin has a long history of giving back to and serving the community that predates the prosecution of this case. To honor his grandfather's legacy, he co-founded From the Depths, a nonprofit which assists Holocaust survivors and others who risked their lives to shelter Jewish children and families during the Holocaust, in 2014. Jonathan Daniels, the Executive Director and Founder of From the Depths, explains that Mr. Levin has played a "crucial role" in the organization's mission. Exh. 1, Ltrs. in Supp., at 16. With Mr. Levin's critical help, as Daniels describes, the organization has documented and preserved the testimonies of hundreds of Holocaust survivors and has sought to provide recognition to every remaining living person who took risks during the Holocaust to save Jewish people. *Id*. In addition, From the Depths has established a humanitarian support network, delivering hundreds of thousands of dollars in essential goods—such as clothing, medical supplies, and generators—to communities in need. *Id*. Mr. Levin has continued to support this mission since its inception.

Rabbi Yitz Jacobs also writes to offer his support and share his experiences with Mr. Levin. Rabbi Jacobs has known Mr. Levin for more than 16 years, having traveled with him to Israel, Washington, D.C., and Costa Rica in connection with programs sponsored by Aish HaTorah, a Jewish outreach organization. Exh. 1 at

42. Even though Aish HaTorah will fund such programs at no cost to participants, Rabbi Jacobs highlights that Mr. Levin often "chose not to receive the flight subsidy commonly offered for our programs, explaining that those funds would be better spent supporting someone who could not otherwise afford to attend. He never announced this choice; I learned of it only because I am responsible for the program budgets." *Id.* at 43.

Mr. Levin has also contributed to the Jewish community in Los Angeles through his leadership in the Jewish Federation's Finance and Investment Division, including serving as its Chair for a period of time. As Heath Binder, a friend who met Mr. Levin through the Jewish Federation, describes in his letter, Mr. Levin "led a Federation mission to Israel and Poland, helping participants connect deeply with Jewish history, identity, and purpose. All of this was done as a volunteer, driven by care rather than recognition." Exh. 1 at 36-37. Mr. Binder recalls seeing Mr. Levin "quietly help friends find jobs, access resources, or simply feel less alone, without ever seeking credit" and explains that the two men have volunteered together at the Jewish food pantry in Los Angeles, sorting and distributing groceries for families facing food insecurity. *Id.*

All of Mr. Levin's involvements predate the offense and he continues to actively participate in these organizations despite the emotional weight of his conviction.

3. *Mr. Levin Also Lends a Helping Hand on Individual Bases*

Mr. Levin has also served the community outside of recognized organizations, established projects, and other nonprofits. He has long understood that even small acts of generosity can often make the biggest difference in another person's life. The diversity and breadth of individuals who have written in his support, explaining how Mr. Levin came to their aid in their times of need, illustrate Mr. Levin's deep commitment to supporting others in crisis.

A few representative letters typify Mr. Levin's caring approach to others.

The first is the letter written by Alma Kadeem, a near stranger to Mr. Levin. Exh. 1 at 78. As Kadeem explains, she found herself distracted during her professional appointment with Mr. Levin. Upon inquiry from Mr. Levin whether she was okay, she opened up that her mother in Israel was suffering from a serious medical condition. Although she had purchased a plane ticket to visit her, the flight was weeks away and the booking was non-refundable. Mr. Levin immediately secured a refund for Kadeem and then used his own frequent-flyer miles to purchase a next-day ticket for her. "Go be with your mom," Mr. Levin told her. Kadeem writes: "A stranger, and he helped me like family." *Id.*

Lyndsie Rister's letter tells a similar story. Rister, a single mother, met Mr. Levin when he employed her as a housekeeper. Exh. 1 at 32. At the time, Rister lived paycheck to paycheck and received government assistance. As a result, there were times when she was short on gas or food for her children. Mr. Levin "was there" for her, providing financial assistance. "Because of [Mr. Levin], I was able to show up for my children and give them a sense of normalcy and joy during a time that could have been very painful." When Rister's home was close to foreclosure, Mr. Levin brought a group of people together and raised thousands of dollars to help her family get through the crisis. *Id.* at 33.

Mr. Levin's support was not merely financial. He helped Rister budget, plan ahead, and find "better opportunities for my kids and myself." *Id.* at 33.

Natalija Kandic's letter serves as a final and powerful example of how deeply Mr. Levin cares for those in his life. In her letter, Kandic, who now serves as Mr. Levin's office assistant, describes her background and a time of vulnerability:

> I come from Serbia, a country that has experienced war and hardship. As a child, I was a refugee, moving from place to place. My father, an army officer, was the backbone of our family. Five years ago, . . . he was diagnosed with an advanced and aggressive form of colon cancer [and] it felt as if the ground disappeared beneath us. I was trying to be "the strong one" for my mother and sister while also doing my job and trying to perform on all fronts.

Exh. 1 at 39.

Kandic explains that Mr. Levin did not just offer his sympathy. Instead, Mr. Levin "spent a lot of his own time researching treatment options, reaching out to people he knew, and finding specialists who might help. He even offered to fly my entire family to the United States at his own expense so that my father could receive more advanced care. He made it clear that no request was too big and that he would support us in any way he could." *Id*. Kandic confirms: "I will never forget that. As a young woman who felt hopeless and helpless, it took one person—just one—to be as kind as Mr. Levin and to say, in words and actions, I've got your back; you will be safe." *Id*.

These narratives highlight only a slice of Mr. Levin's contributions. Mr. Levin has also been engaged in individual advocacy projects for pediatric and oncology patients. In 2021, Mr. Levin orchestrated a comprehensive support campaign for a child battling neuroblastoma. Exh. 1 at 3-4. He raised over $7,500 for immediate medical expenses and curated a $35,000 "Dream Trip" to Hawaii for the patient and the family. The experience was meticulously managed by Mr. Levin to include VIP logistics and specialized therapeutic encounters, such as marine wildlife interactions and glass-bottom boat tours. *Id.*

On another occasion, when faced with an acquaintance's diagnosis of lung cancer, Mr. Levin leveraged his own professional network to bypass traditional medical bottlenecks and secured immediate access to experimental drug trials, granting the family invaluable time together. Exh. 1 at 20-21.

4. *Mr. Levin Has Engaged in Significant Post-Offense Rehabilitation by Addressing his Marijuana Addiction, Achieving Sobriety, and Devoting Significant Efforts to Educate and Counsel Others Impacted by the Criminal Justice System*

While Mr. Levin would have historically turned to cannabis to cope with the stress and anxiety of this case, he has instead committed himself to a life of sobriety, attending weekly group meetings at the Shell House for Sober Living, and

supporting others with their sobriety.

Mr. Levin has also become an outspoken critic of the cannabis industry and has used his public-facing persona to warn against the hidden dangers of cannabis abuse. Mr. Levin published an article in *USA Today*, explaining "I built companies, ran media platforms and helped shape conversations around marijuana—all while believing it was largely harmless." But Mr. Levin now warns others of the harmful effects of cannabis use, explaining "it also dulled motivation, narrowed emotional range and made it harder to engage with stress, conflict and personal growth."[11] Mr. Levin has been honest about his experiences, recognizing that "while cannabis was not the cause of my legal circumstances, I came to recognize how complacency and normalization can dull judgment and delay accountability. That distinction matters. Responsibility is not only about isolated decisions but about the environments and habits that shape them."[12]

In addition, Mr. Levin has become a role model by sharing his story with business students across the country. He has used his own history as a cautionary tale for those seeking to enter careers in business, emphasizing the importance of remaining true to the highest standards of moral and ethical behavior, including, and especially, when under pressure.

Mr. Levin's experience with the criminal justice system has also opened his eyes to the struggles faced by many formerly incarcerated persons upon release from prison, leading him to found *Second Chance Services*, a non-profit organization

[11] Adam Levin, *I ran Hight Times Magazine. Cannabis reform needs safeguards* , USA Today (Dec. 30, 2025), https://www.usatoday.com/story/opinion/voices/2025/12/30/trump-marijuana-executive-order-weed-benefits-risks/87778167007/.

[12] Adam Levin, *On Cannabis, Responsibility, and Leadership that Chose Reform Over Fear*, Int'l Bus. Times (Jan. 08, 2026) https://www.ibtimes.com/cannabis-responsibility-leadership-that-chose-reform-over-fear-3794807.

providing reentry and rehabilitation services. Mr. Levin has spent much of the last year working alongside Judi Garrett, the former Assistant Director of the Federal Bureau of Prisons (BOP), building up the non-profit organization, which provides reentry services to those recently released from prison who are seeking a new and better life. Under his leadership, the organization has raised over $100,000 to fund its mission. By leveraging an entirely volunteer professional staff and securing strategic partnerships, Mr. Levin ensures that 100% of the organization's funds are directed toward participants' stability, financial literacy, counseling, and job placement. Over 50 individuals have been served by *Second Chance Services* to date.[13] Reflecting on Mr. Levin's impact on the organization, Garrett notes that he is "a special person who doesn't see obstacles and looks to help those while he himself is facing his own challenges."[14]

In sum, Mr. Levin has a substantial history of good deeds—to his family and to the community. Since the offense, he has pursued sobriety and tried to make a positive, broad-reaching change out of his mistakes. A prison sentence would be unnecessary under these circumstances and only serve as an impediment to his ongoing commitments to his family and the community.

---

[13] *Second Chance Services* was also recently highlighted by *Business Matters* for organizing a two-day intensive workshop in partnership with the Hoffman Institute to help participants "examine the emotional weight of living with a federal conviction." One participant shared, "this weekend allowed me to address my crime, and helped me not to identify myself as my story. It gave me renewed hope." *Healing, Hope, and a Second Chance: A Transformative Valentine's Weekend* , Bus. Matters Magazine (Mar. 18, 2026) https://bmmagazine.co.uk/business/healing-hope-and-a-second-chance-a-transformative-valentines-weekend/.

[14] Adam Mandel, *Redemption as Responsibility: Why Adam Ezra Levin Is Building Second Chance Services*, Int'l Bus. Times (Mar. 19, 2025) https://www.ibtimes.co.uk/redemption-responsibility-why-adam-ezra-levin-building-second-chance-services-1786793.

5. *Mr. Levin's Approach to Business*

Despite the challenges he faced, Mr. Levin refused to be defined by his circumstances and instead used those early experiences as fuel for growth and ambition.

Over the course of his career, Mr. Levin has demonstrated vision in acquiring and scaling multiple successful businesses across diverse industries. He has acted as CEO and Managing Director of Oreva Capital Corp., an investment firm that has made several impactful investments in the healthcare, technology, and media industries. Mr. Levin also founded and helped expand Boxlight Corporation, a public education company focused on providing interactive STEM education solutions to thousands of K-12 students.

Several notable business figures have written on behalf of Mr. Levin, and each of these letters attests to Mr. Levin's integrity in connection with their business dealings. Exh. 1.

One example deserves particular attention. Richard Nanula, the former Chief Financial Officer of both the Walt Disney Company and Amgen and a current member of the Board of Directors of the Boeing Company, describes his observation that Mr. Levin was more committed to transforming HTH into a high-quality business than he was in making a quick profit. Exh. 1 at 55-56. In particular, Nanula recalls that Mr. Levin "had a viable opportunity to pursue an early SPAC transaction that would have yielded him more than $75 million in stock," but, notwithstanding the lucrativeness of that opportunity, Mr. Levin "chose not to pursue the expedited liquidation path because he believed the [High Times] business required additional operational foundation before entering the public markets." *Id*. at 55. To quote Nanula, Mr. Levin eschewed the "easier route" because he "prioritizes long-term integrity and operational readiness over short-term gain." *Id*.

**D. Mr. Levin's Significant Cooperation Supports a Probationary Sentence**

Mr. Levin's cooperation demonstrably assisted the government. Mr. Levin met with the government for a lengthy proffer, discussing his own involvement in the offense as well as identifying other stock issuers, including Kiran Sidhu, Rick Bentley, and Daniel Carcillo, who had also compensated Mikula through cash and entertainment. During this interview, Mr. Levin identified those who introduced Mr. Levin to Mikula and PBV, including Elliot Milian of Hybrid Financial, Ltd. and Darren Marble of Issuance. Mr. Levin recounted for the government a conversation he had with Milian during which Milian reported that over 75% of the companies featured in PBV were Hybrid Financial's clients. Mr. Levin further disclosed that Milian had offered to serve as the middleman to pay Mikula for PBV's promotions of HTH. He also provided information about Bentley and his scheme with Mikula. Throughout the proffer, Mr. Levin provided a detailed history of the offense and all its participants, including how the scheme was concealed through elaborate sham consulting agreements. Mr. Levin pointed the government to key evidence, including text messages and emails, revealing details of the scheme. Finally, Mr. Levin identified an unrelated pump-and-dump scheme for the government.

Mr. Levin has received threats on Instagram because of his cooperation. A pro-cannabis Instagram account, upset with Mr. Levin because of his outspoken criticism of the cannabis industry, posted about the under-seal filings in this case to posit that Mr. Levin was cooperating with the government. At least one comment was posted to the account identifying Mr. Levin as a "rat."

Although a previous prosecutor on this case advised Mr. Levin that his cooperation was important, the government has elected not to file a substantial-assistance motion under U.S.S.G. § 5K1.1. The defense has been unable to determine why this decision was made. In any case, every circuit to consider the question has found that sentencing courts may vary downward under § 3553(a) for a

defendant's efforts at cooperation despite the absence of a § 5K1.1 motion. *United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014); *United States v. Landrón—Class*, 696 F.3d 62, 77-78 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1621, 185 L. Ed. 2d 605 (2013); *United States v. Massey*, 663 F.3d 852, 858 (6th Cir. 2011); *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011); *United States v. Doe*, 398 F.3d 1254, 1260-61 (10th Cir. 2005). The Court should do so here.

**E. The Recent Amendments to the Guidelines Should Be Taken into Account**

As explained, Guidelines Amendments concerning the Loss Table and sophisticated means enhancement, which become effective on November 1, 2026, would reduce Mr. Levin's Total Offense Level by at least four levels, to level 13. That falls in Zone C of the Sentencing Table. *Supra* at 5. Although the Amendments are not yet effective, the Court may still downwardly vary based on them. *E.g.*, *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011) ("A sentencing court, of course, has the discretion to grant a variance from the Guidelines after promulgation but before adoption of a proposed amendment. . .").

According to the U.S. Sentencing Commission's Judiciary Sentencing Information platform (JSIN),[15] during the last five fiscal years (FY2021-2025), there were 971 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 13 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial-assistance departure. Over one third received noncustodial sentences. And the median sentence overall was six months. This sample is somewhat unfair to Mr. Levin, given (1) that his cooperation with the government was significant notwithstanding the absence of a § 5K1 motion, and (2) the unprecedented nature of his offense.

Zooming in on comparable local cases, approximately 234 defendants were

[15] https://jsin.ussc.gov/.

sentenced in this district between FY2020-2025 under § 2B1.1, in Zones A-C and Criminal History Category I, excluding defendants who received a § 5K1.1 departure, according to data extracted from the Commission's .csv datafiles.[16] At least 133 of the defendants in the cohort, or 56.8%, received either a probationary sentence or a sentence involving home confinement. Approximately 59 defendants in that cohort were sentenced in Zone C. While that is a more modest sample size than the set for Zones A-C, approximately 42.4% of the Zone C defendants received a noncustodial sentence.

The Court should vary downward as though the Loss Table and sophisticated means amendments apply, particularly because these are mechanical adjustments that do not involve discretionary judgment and apply universally to all defendants sentenced under § 2B1.1. The Loss Table reduction results from inflation and the residual clause of the sophisticated means specific offense characteristic will be eliminated entirely. *Supra* at 5.

### F. Imprisonment is Not Necessary to Achieve the Goals of Deterrence and Protection of the Public

A probationary sentence is also sufficient to meet the goals of deterrence and public protection under 18 U.S.C. § 3553(a)(2)(B)-(C). In fact, as Mr. Levin qualifies for the Zero-Point Offender adjustment under U.S.S.G. § 4C1.1, until November 1, 2025, the Guidelines encouraged downward departure to a sentence "other than imprisonment" for such offenders. § 5C1.1, comment. (n.10(B)) (2024).[17] This provision was in recognition of the fact that probation generally is sufficient for those like Mr. Levin who evidence very little likelihood of reoffending.

---

[16] https://www.ussc.gov/research/datafiles/commission-datafiles

[17] This departure provision was removed when the Commission voted to eliminate all downward and upward departures across the board effective November 1, 2025.

As for specific deterrence, Mr. Levin poses virtually no risk of reoffending. At his age, the likelihood of recidivism is negligible. *See United States v. Ruiz*, No. 04 Cr. 1146, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (noting defendants over age 40 exhibit "markedly lower recidivism rates in comparison to younger defendants"). As mentioned, his conviction has already caused severe reputational and professional harm—consequences courts recognize as meaningful deterrents. *See United States v. Munir*, 953 F. Supp. 2d 470, 475 (E.D.N.Y. 2013); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). He will also face a substantial financial penalty, in addition to the penalty already imposed by the SEC, further reducing any risk of future misconduct. Moreover, Mr. Levin has fully complied with all conditions of pretrial release, confirming he is a low-risk supervision case. PSR ¶ 9. Probation's supervision will impose additional structure and accountability, ensuring continued law-abiding conduct.

A probationary sentence also fully serves the goal of general deterrence. No reasonable person would view this outcome—public conviction, felony record, home confinement, financial penalties, and reputational harm—as a crime worth committing. The government's message has already been sent loudly and clearly, regardless of whether Mr. Levin serves prison time.

Finally, research and courts agree that certainty of punishment—not its severity—is what most effectively deters crime. *See*, *e.g.*, *United States v. McCarthy*, No. 22 Cr. 491, 2023 WL 3741996, at *3, n.1 (E.D.N.Y. May 30, 2023) (noting that "[t]he deterrent effect of . . . the certainty of punishment is far more convincing and consistent [than severity]"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209 (S.D.N.Y. 2004) ("[T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range."). Imprisonment would not meaningfully increase deterrence beyond what a probationary sentence already accomplishes for Mr. Levin.

### G. A Probationary Sentence Achieves the Purposes of Sentencing

Mr. Levin's exceptional rehabilitation efforts, particularly his role in founding Second Chance Services (PSR ¶ 94), independently support a downward variance. *See United States v. Green*, 152 F.3d 1202, 1207 (9th Cir. 1998) (noting that "[s]everal circuits have already determined that post-offense rehabilitation may be a basis for departure" and indicating accord); Amendment 602 to U.S.S.G. § 5K2.19 (Commentary) (Nov. 1, 2000) ("This amendment does not restrict departures based on extraordinary post-offense rehabilitative efforts prior to sentencing. Such departures have been allowed by every circuit that has ruled on the matter. . .") (citations omitted).

Mr. Levin's desire to improve himself and his community is not merely a consequence of his conviction. Mr. Levin's lifelong commitment to his family, friends, and community—together with his integrity, accountability, and full and timely acceptance of responsibility (PSR ¶34–35)—further supports a non-custodial sentence. *See* 18 U.S.C. § 3553(a)(1); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("[i]f ever a man is to receive credit for the good he has done, . . . it should be at the moment of his sentencing").

Mr. Levin's friends, family, and even strangers consistently portray a man who is compassionate, reliable, and service-minded—not someone who poses any risk of recidivism. *See also United States v. Cunniffe, et al*. (Robert Stewart), No. 15 Cr. 287 (S.D.N.Y. May 4, 2016) (LTS), ECF 95 at 28-29 (crediting defendant's contributions to the lives of others in imposing probationary sentence).

## IV. CONCLUSION

In light of the mitigating circumstances of the offense, the need to avoid sentencing disparities, Mr. Levin's exceptional character and involvement with the community, and his own rehabilitative efforts, Mr. Levin respectfully requests that

the Court adopt the government's noncustodial-sentence request[18] and impose a sentence of probation.

Dated: July 17, 2026

Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

**Certificate of Service**

I hereby certify that on the 17th day of July, 2026, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):counsel of record.

*/s/ Nicholas D. Smith*

[18] Probation presented a fine range of $10,000 to $95,000 for Mr. Levin. PSR at 3. Mr. Levin understands that the government's revised submission will request a more substantial fine. Mr. Levin will honor any fine the Court decides is appropriate under 18 U.S.C. § 3571.